UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN HOLDEN,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | CASE NO. 1:11-cv-00716-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff Benjamin Holden, proceeding *pro se* and *in forma pauperis*, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge. Following a review of the complete record and applicable law, this Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.

I.  **Administrative Record**

A.  **Procedural History**

On March 23, 2007, Plaintiff filed an application for supplemental security income, alleging disability beginning September 7, 2006. His claim was denied initially on June 8, 2007,

///

and upon reconsideration on September 25, 2007. On November 21, 2007, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at the hearing on June 11, 2008. On December 9, 2008, Administrative Law Judge Laura Speck Havens denied Plaintiff's application. The Appeals Council denied review on December 13, 2010. On April 28, 2011, Plaintiff filed a complaint seeking this Court's review.

### B. Factual Record

Plaintiff (born May 28, 1958), completed high school and one year of college. He worked in a series of jobs requiring manual labor, starting as a child assisting his father in the family's landscaping business. He was also a singer but had not earned money singing in the past fifteen years.

Plaintiff lived with Barbara McKinney, whom he described at various times as a friend, his girlfriend, and his fiancee, although on one occasion, he emphasized that they did not hold themselves out as husband and wife. Plaintiff testified that Ms. McKinney performed most of the household chores, although he mowed the lawn and helped out "as much as possible." AR 40.

Plaintiff walked two or three times weekly until "the pain kick[ed] in," about twenty minutes. AR 41. He played basketball for fifteen or twenty minutes until the pain became "excruciating." Plaintiff no longer had an appetite and was able to sleep only two hours at a time, for a total of four hours nightly. He watched television all day. In a questionnaire dated April 20, 2007, Plaintiff reported that he could walk one-half mile to the park, drove his own car, performed lawn work, and worked on his own car.

Plaintiff had a history of lower back injuries, including a 1978 motor vehicle accident and a work-related injury in 1995. In July 2006, Plaintiff was twice treated in the emergency room of Doctors Medical Center for lower back pain.

On September 7, 2006, while employed by a temporary staffing agency, Plaintiff was assigned to perform general labor at a winery. He was injured in an accident that he described in various ways during the pendency of his application for SSI benefits. Plaintiff later told Michael

Kasman, M.D., who performed an agreed examination for workers' compensation purposes, that he left work on his own initiative about 35 minutes after the accident because he felt dizzy and weak. He did not complete a workers' compensation claim form. When he reached home, he took pain pills that had been prescribed for his girlfriend and went to sleep.

In the initial injury report for workers' compensation, dated September 13, 2006, Renee L. Marshall, M.D., reported that, six days earlier, Plaintiff had been hit in the face by wine under pressure when he opened a machine. Plaintiff was knocked backwards but experienced no loss of consciousness. He later experienced visual changes and dizziness, vomiting, and severe pain in his neck and left wrist. (Notably, Plaintiff did not then complain of lower back pain.) Plaintiff had not previously consulted a doctor. Following a comprehensive examination, Dr. Marshall diagnosed strains of the back and wrist and an unspecified head injury. She prescribed Soma and ibuprofen, instructed Plaintiff in the use of hot and cold packs, and directed Plaintiff to remain off work for two days. Dr. Marshall released Plaintiff to return to work on September 15, 2006.

On September 21, 2006, Plaintiff was transported to the emergency room of Doctors Medical Center after fainting at home. CT scans of Plaintiff's brain and cervical spine revealed no abnormalities. A urine test was positive for marijuana. On September 25, 2006, Plaintiff drove himself back to the emergency room, complaining of headache and dizziness. He told medical personnel that he had been "hit in the face by an exploding wine vat." AR 183.

On October 2, 2006, Plaintiff was back in the emergency room, complaining of neck and back pain. Plaintiff told emergency room personnel that he was out of the medications and could not sleep. Notes reported that Plaintiff had sustained a falling injury when a wine bottle that was about to be emptied flashed in Plaintiff's face, causing him to strike his head and neck on the ground. A physical examination revealed Plaintiff as "alert, awake, comfortable, lying on the bed, no guarding." AR 187. His spinal area was tender to palpation, with muscle tension and spasm. Robert Barandica, M.D., diagnosed muscle strain and administered Toradol and morphine for pain relief, as well as multiple trigger point injections of lidocaine and Depo-Medrol. He prescribed Motrin, Soma, and Norco. At discharge, Plaintiff's pain was 1/10.
///

On October 9, 2006, Plaintiff again went to the emergency room, complaining of back pain and reporting that he had run out of pain medication two days earlier. Plaintiff told emergency room personnel that about one month prior, he had been hit in the face by wine under pressure and knocked 200 feet in the air. Noting that Plaintiff reported normal CT scans and x-rays, Jon Johnston, D.O., identified Plaintiff's problem as needing his prescriptions refilled and referred Plaintiff to the workers' compensation clinic.

On October 16, 2006, Plaintiff returned to the emergency room, complaining that his generalized pain was 10/10 and that he had run out of pain medication the day before. Plaintiff was ambulatory with a steady gait. Nurse practitioner Kellie Amador noted that Plaintiff had been to the emergency room five times in less than a month and had received multiple prescriptions for narcotic pain relievers and muscle relaxants. If Plaintiff were taking the medications as directed, he should have had a significant amount of medication. After Plaintiff was unable to provide a satisfactory explanation of his failure to follow up his emergency care with an occupational health provider, Ms. Amador advised him that he would not receive further prescriptions for narcotic pain relievers or muscle relaxants from the emergency department. Instead, Ms. Amador offered Plaintiff an injection of Toradol for his pain, which he declined, walking from the emergency room with a steady gait without waiting for his discharge instructions. Plaintiff's diagnosis was chronic pain syndrome.

On October 22, 2006, Plaintiff went to the emergency room complaining of lower back pain and reporting that he had run out of his pain medication the day before. He claimed that he had re-injured himself while sweeping. Emergency room notes reported that Plaintiff's current injury dated to September 17, 2006, and that Plaintiff had also been to the emergency room six times previously complaining of lower back pain. Radiologist Gordon Zink-Brody, M.D., evaluated three lumbar spine x-rays and three lumbo-sacral spine x-rays and found no acute injuries. Plaintiff was diagnosed with back soft tissue sprain.

Physiatrist Patrick Rhoades, M.D., initially examined Plaintiff on October 26, 2006. Plaintiff told Rhoades that he was on a 150-foot tower when he pulled the valve from a wine tank. The valve popped and hit him in the head, and he was bombarded with many gallons of

4

wine.  Plaintiff was unconscious but held on for three or four minutes until he was able to climb down.  He was now experiencing constant burning, stabbing, throbbing, aching, electrical, pounding, and aggravating pain in his head, neck, and back.  Medication and rest helped.  Sitting, moving, or doing housework made the pain worse.  He had been seen in the emergency room, where he was diagnosed with back strain and concussion, but no broken bones.

Rhoades' examination revealed diffuse pain in the cervical paraspinal, trapezius, thoracic paraspinal, and lumbar paraspinal muscles.  Range of movement was limited in all respects.  Plaintiff reported occasional urinary incontinence.  Rhoades recommended physical therapy, diagnostic MRI, medication, and trial of an H-unit.

On November 9, 2006, Plaintiff reported neck and head pain, which he rated 10/10.  Dr. Rhoades administered trigger injections and prescribed Cialis and OxyContin.[1]

On November 16, 2006, Plaintiff reported that his medication did not help his pain (rated 8-10/10) and caused upset stomach and heartburn.  Dr. Rhoades again administered trigger point injections and gave Plaintiff a sample package of Cialis.

On both November 21 and 27, 2006, Dr. Rhoades prescribed Norco/Hydrocodone (10/325 mg., 4 tablets six times a day: 200 tablets dispensed) and Soma/Carisprodol (350 mg., 1 tablet three times a day: 90 tablets dispensed).

On December 7, 2006, Plaintiff told Rhoades that workers' compensation had denied physical therapy and the MRI.  He had lost his MS Contin, and workers' compensation would not authorize a refill until it was due.  Dr. Rhoades re-prescribed OxyContin.

On December 20, 2006, Plaintiff complained of severe head and neck pain.  Dr. Rhoades again prescribed Norco/Hydrocodone (10/325 mg., 4 tablets six times a day: 200 tablets dispensed) and Soma/Carisprodol (350 mg., 1 tablet three times a day: 90 tablets dispensed).  Radiologist Mark R. Goldberg, M.D., reviewed an MRI scan of Plaintiff's lumbosacral spine.  He identified mild degenerative changes, a central disc herniation at L 4-5, and a small annular tear at L5-S1.

---

[1] Cialis (Tadalafil) is prescribed to treat erectile dysfunction and benign prostatic hyperplasia.  Dr. Rhoades' records do not explain why he prescribed it for Plaintiff, whose complaint was intractable (10/10) pain.

On March 5, 2007, Plaintiff saw Delbert Morris, M.D., at Stanislaus County Health Services. Plaintiff told Dr. Morris that he had been injured the prior September when a wine tank exploded, incurring neck and back sprains and a concussion. He had last seen Dr. Rhoades in February 2007, and had been without Oxycontin for three weeks and without Soma and Norco for two weeks. He had begun taking ibuprofen. Plaintiff's drug screen was negative for amphetamine, barbiturate, benzodiazepines, cocaine, opiates, and PCP, but positive for THC.

On April 5, 2007, Dr. Delbert of Stanislaus County Health Services examined Plaintiff, who complained of headache, neck pain, and lower back pain. Plaintiff, who moved slowly, sought a prescription for ibuprofen. Dr. Delbert noted that Plaintiff smelled of cannabis.

On May 18, 2007, radiologist Ernest J. Madarang, M.D., reviewed MRI scans of Plaintiff's brain and cervical spine. He observed no acute intra cranial abnormalities, although he identified inflammatory changes to Plaintiff's sinuses. Dr. Madarang identified mild degenerative disc disease at C4-5 and C 5-6.

Agency medical consultant R.D. Fast prepared a physical residual functional capacity assessment on May 30, 2007. Dr. Fast opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand, walk, and sit about six hours in an eight-hour workday; and had unlimited ability to push and pull. Fast questioned the credibility of Plaintiff's claimed 10/10 pain but acknowledged that Plaintiff did exhibit degenerative changes of the cervical and lumbar spine.

On July 24, 2007, Michael A. Kasman, M.D., who is board certified in both psychiatry and neurology, conducted an agreed medical evaluation for workers' compensation purposes. Plaintiff, who arrived using a cane, explained to Dr. Kasman that the cane helped him balance and took "'the torquing off the back.'" AR 285. Dr. Kasman's examination revealed no post-traumatic head syndrome and no other serious abnormalities.

Dr. Kasman reported Plaintiff's responses to a functional capacity assessment.

> He felt he could brush his teeth, comb his hair, dress himself (problems with balance), bathe and feed himself. Regarding controlling bladder/bowels "I'm up all hours of the night . . . lots of constipation" (COMMENT: Not indicating incontinence). There are no difficulties with writing, typing, speaking or hearing, but his eyes constantly water and are sensitive to light. He can stand, sit, recline,

> walk a block, climb stairs, drive or ride in a car for an hour, and would be able to ride public transportation. He can feel things normally, but there is numbness and tingling. Taste and smell are normal. He can grasp and hold things, lift/carry groceries and feel the difference between a dime and a nickel, although his hand strength seems weak. He has problems with sex and does not achieve restful sleep. He can lift/carry 50 lbs. with pain. He can stand eight hours a day and sit eight hours a day. There is unlimited pushing and pulling. He can never climb; he can occasionally balance, stoop, kneel, crouch, crawl, twist, reach, handle/finger, feel, see hear and speak.

AR 293.

Neurological testing was normal. No findings explained Plaintiff's reported incontinence or indicated a need for a cane. The doctor observed:

> I can think of no test or treatment that has not been utilized that would help clarify his current pain disorder. That disorder is atypical since [Plaintiff] has not improved from a disorder that is essentially soft tissue. Most telling is the cognitive problems which should be maximum at the time of the injury and wane over time. There were non-organic findings on examination today and some issues of credibility with [Plaintiff's] history.

AR 289.

Dr. Kasman opined that Plaintiff was unable to return to his usual work based on a range of motion analysis sometimes used in workers' compensation determinations when the disability is the result of multiple injuries. He recommended a limited medical award, noting that neither surgery, physical therapy, acupuncture, massage, nor chiropractic treatment were indicated and that continuing treatment should consist of pharmacotherapy and home physical therapy exercises. He suggested a comprehensive neuropsychological examination by a colleague, Claude S. Munday, Ph.D., to determine whether an underlying disorder was mimicking post-concussion syndrome.

On August 7, 2007, Dr. Madarang analyzed a CT scan of Plaintiff's lumbar spine, finding mild degenerative disc disease.

Dr. Munday examined Plaintiff on March 11, 2008, and provided a report on April 30, 2008. Munday reported yet another of Plaintiff's accounts of his accident:

> [H]e worked a winery and it was only his second day on the job. His job was to clean the tanks and these were big, huge 650,000 gallon tanks. They would hose them down. He was sent to open the tank and he opened the tank and it turned out it was full. It blew up in his face. He was 150 feet or so up in the air at the time. "I released the clasp, that was it." Next thing he knew, he was lying on the platform and wine was pouring all over him. He explains that he was knocked out

7

and back. He does not know how long he was out. Everybody was screaming, some more people had arrived. They screamed at him to come down. Fortunately he landed on a walkway between the two tanks and did not fall. If he had not stayed on the platform, "I'd be dead." He was eventually able to come down. He climbed blind with wine in his eyes. Everybody sort of stayed away from him, told him to sit and gather himself. He sat down for approximately an hour and then his supervisor sent him home. He went home full of wine. The pain did not really set in until the next day. It was at least two or three days before he went to the doctor. By that time the headache was outrageous, his back was stiff. Consequently he went to an emergency room. They treated him for syncope, head and back injuries. He was given cortisone shots. Dr. Rhoades did these.

AR 301-02.

Dr. Munday administered a battery of tests including, among many others, the Wechsler Adult Intelligence Scale, Rey Auditory Verbal Learning Test, Logical Memory III, Verbal Tracking, Trailmaking A and B, and the Minnesota Multiphasic Personality Inventory II. Plaintiff made adequate effort and generally did well on the tests. His intelligence was in the low normal range (90, verbal; 78, nonverbal; 84, full-scale IQ). He demonstrated "mild general attentional weakness." AR 312.

Dr. Munday noted little attention in the medical reports to Plaintiff's head injury or to the likelihood of Plaintiff's developing problems with cognition, mental status, or post-concussion symptomology. Plaintiff's test performance was not consistent with the aftermath of a head injury. Accordingly, Dr. Munday rejected the likelihood that Plaintiff's condition resulted from brain pathology. Instead, he opined that any neuro-psychological impairment likely reflected Plaintiff's chronic pain syndrome, either because of distraction by pain or from the impact of sedating and narcotic medications. As a result, Plaintiff did not require cognitive rehabilitation, neuropsychiatric treatment, or the like. Beneficial treatment would need to focus on Plaintiff's chronic pain syndrome, which was outside of Dr. Munday's expertise.

At his agency hearing on June 11, 2008, Plaintiff explained that he took the brunt of the blast on his head, neck, and shoulder area, falling backwards and landing on his back, neck, and arm.

On July 26, 2008, rehabilitative orthopedist Cesar P. DuClair, M.D., examined Plaintiff at the request of the ALJ. DuClair found mild degenerative changes in Plaintiff's cervical and lumbar spine, but no evidence of acute injury. Dr. DuClair summarized:

8

> The number of hours the claimant can be expected to stand or walk in an eight hour work day is not restricted. The number of hours the claimant can be expected to sit in an eight hour work day is not restricted. He does not need an assistive device for ambulation regardless of distance or terrain. The amount of weight the claimant will be able to lift and carry if up to 50 pounds on a frequent basis and up to 75 pounds on an occasional basis. The claimant has no postural limitations. There are no manipulative limitations. There are no relevant visual, communicative, or workplace environmental limitations.

AR 317.

## II. Discussion

### A. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

///

| | | |
|---|---|---|
| 1 | Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of March 23, 2007. His severe impairments were obesity and mild degenerative disc disease of the cervical and lumbar spine. This impairment did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926). Plaintiff was capable of performing the full range of medium work as defined in 20 C.F.R. § 416.967 (c), including his past relevant work as a landscaper. In the alternative, jobs that Plaintiff was capable of performing existed in significant numbers in the national economy.

**B.** **Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### C. Plaintiff's Credibility

Analysis of the administrative determination in this case begins and ends with Plaintiff's serious lack of credibility, attributable to his progressive conflating of the circumstances of his on-the-job injury and abundant evidence of narcotic drug seeking behavior. As Judge Havens put it, "[T]here is a stark difference between the objective findings and the subjective report of the claimant." AR 22.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*,

533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

The ALJ met these requirements, addressing the credibility of Plaintiff's testimony in a nearly ten-page discussion of Plaintiff's residual functional capacity (AR 22-31). After summarizing Plaintiff's subjective complaints and treatment history, the ALJ found that the minor injuries and normal testing results set forth in the medical records simply did not support Plaintiff's claimed inability to work. The ALJ noted Plaintiff's inconsistent accounts of how he was injured, multiple doctors' observations that Plaintiff was not in apparent distress despite his claims of severe pain, inconsistent use of an medically unnecessary cane, denial of recreational drug use despite positive drug tests and doctors' noting that he smelled of marijuana, and inconsistent reports of incontinence and constipation. Plaintiff exhibited drug-seeking behavior including requiring prescription refills when he should have retained sufficient medication and refusing to accept a pain-relieving injection of Toradol in lieu of a prescription for narcotics even though he claimed to be severe pain. She questioned whether, consistent with other indicia of

12

drug-seeking behavior, Plaintiff embellished his pain reports to his physicians to receive pain medication. The ALJ found "inconceivable" that if Plaintiff experienced the degree of pain he alleged, he would have given up all pain medication because he hated medication and pills, as he had testified in the administrative hearing.

The ALJ also noted inconsistencies between Plaintiff's allegations of extreme pain and his typical activities, including his ability to dress and bathe himself; to wash dishes, sweep, and mop; to mow the lawn; to shoot basketball; to walk several times each week; and to drive for several hours. She noted multiple doctors' reports of a steady or normal gait, including the instance in which he refused the offer of a Toradol shot in lieu of prescription drugs and eloped from the emergency room before being discharged. In short, substantial evidence supported the ALJ's determination that Plaintiff lacked credibility.

### D. Physicians' Opinions

Plaintiff challenges the ALJ's analysis of the medical evidence in the record. Not surprisingly, he argues that the ALJ should have accepted those opinions indicating that he was disabled.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S. S. R. 96-5p. The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d). In this case, opinions on Plaintiff's ability to perform work were provided by Drs. Fast, Kasman, Munday, and Rhoades.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

13

(nonexamining physicians)." *Lester*, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831. Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding. *Magallanes*, 881 F.2d at 751-55. The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

Plaintiff's lack of credibility was a key factor in Judge Havens' analysis of the various medical opinions in this case. Because Plaintiff made so many questionable representations to the various physicians who provided opinions of his residual functional capacity, Judge Havens carefully considered each medical opinion as well as securing an additional orthopedic opinion from Dr. DuClair following the agency hearing. Notably, Judge Havens discounted both the opinions of Plaintiff's treating and examining physicians and the opinions of the agency's consultants and physicians as possibly compromised by Plaintiff's subjective representations.

14

Judge Havens gave reduced weight to Dr. Kasman's opinion, noting that his conclusion that Plaintiff was disabled for workers' compensation purposes contradicted his own findings of no serious abnormalities and ignored the imaging studies' failure to corroborate Plaintiff's reported symptoms. She emphasized that Dr. Kasman himself had recognized that Plaintiff's reported symptoms were atypical for a soft tissue injury of the type with which Plaintiff had been diagnosed. Finally, to the extent that Dr. Kasman's opinion was inconsistent with Dr. DuClair's opinion, the ALJ rejected it in favor of Dr. DuClair's more recent and comprehensive examination and report.

The ALJ gave "appropriate weight" to Dr. Munday's opinion, which found no correlation between Plaintiff's claimed cognitive disability and any brain injury.

Ultimately, the ALJ relied largely on Dr. DuClair's opinion, which included a careful review of all medical reports in the agency record and a comprehensive physical examination of Plaintiff. In particular, Judge Havens noted that Dr. DuClair's opinion was consistent with his examination findings and reflected the doctor's clear inclusion of the information set forth in Plaintiff's treatment records and various imaging studies.

An ALJ is not required to accept the opinion of any physician, including a treating physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings. *Thomas*, 278 F.3d at 957. When a treating physician's medical opinion is contradicted by the opinion of another physician, the ALJ is required to do no more than provide specific and legitimate reasons for discounting the treating physician's opinion. *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1228 n.8 (9th Cir. 2009). The ALJ did so here, fully explaining her reasons for favoring Dr. DuClair's opinion.

### E.   **Workers' Compensation Determination**

In arguing for reversal of the Commissioner's decision, Plaintiff relies, in part, on the settlement of his workers' compensation claim, which reflected that Plaintiff was partially disabled as a result of his injury. His reliance on the decision in his workers' compensation case is misplaced.

///

A claimant's ability to work under the Social Security scheme is measured differently from a claimant's ability to work under the California workers' compensation scheme. *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988). Under the workers' compensation scheme, categories of work are not based on strength, but on "minimum demands for physical effort," determined by whether the worker sits, stands or walks for most of the work day. *Id., quoting* Schedule for Rating Permanent Disabilities, Guidelines for Work Capacity, 1-A (California State Labor Code). In contrast, categories of work under the Social Security scheme are differentiated by step increases in lifting capabilities. *Id.* Guidelines for Work Capacity are not conclusive in social security cases. *Macri v. Chater*, 93 F.3d 540, 543-44 (9th Cir. 1996). Although an ALJ may draw logical inferences flowing from evidence of workers' compensation disability determinations, he or she may not directly find a claimant disabled in a social security disability proceeding based on the outcome of the claimant's claim for worker's compensation. *Id.* at 544; *Desrosiers*, 846 F.2d at 576. Thus, no error results from the ALJ's failure to find Plaintiff disabled based on his workers' compensation settlement.

### F. **Post-Hearing Evidence**

Plaintiff contends that the Appeals Council erred in failing to declare him disabled based on the opinion of Dr. Silvia Diego, who completed a CalWorks evaluation approximately twenty months after issuance of the hearing decision in this case, and submits to this Court updated medical records and the declaration of a long-time friend, Frank Gray. None of the evidence submitted after the hearing provides a basis for this Court to remand this case to the Commissioner or to reverse the Commissioner's determination that Plaintiff was not disabled for SSI purposes.

#### 1. **Dr. Diego's Opinion**

On February 22, 2010, mental health consultant Silvia Diego, M.D., completed a CalWorks form in which she indicated that Plaintiff could not sit longer than five to ten minutes at a time as a result of a work injury incurred in 2006, could not reach or bend over, and could not perform work at heights or near heavy machinery due to his pain medications. In addition, Dr. Diego opined that Plaintiff's cognitive abilities were adversely affected by his pain

16

medications, which left him drowsy and dizzy. Plaintiff's mental capacity was also reduced by his medications, poor memory, lack of concentration, inability to follow instructions, and depression. Accordingly, Dr. Diego concluded that Plaintiff was unable to work.

On March 11, 2010, Plaintiff's former attorney transmitted Dr. Diego's opinion to the Appeals Council. On December 13, 2010, despite acknowledging incorporation of Dr. Diego's opinion into the administrative record, the Appeals Council denied review. Plaintiff contends that the Court must take notice of Diego's report since it is contrary to the ALJ's determination.

To justify a remand for consideration of Dr. Diego's opinion, Plaintiff must establish that the opinion is material to determining his disability and that he had good cause for failing to produce the opinion in the course of the proceeding. *See* 42 U.S.C § 405(g). Plaintiff does not address the element of good cause.

"To be material under section 405(g), the new evidence must bear 'directly and substantially on the matter in dispute.'" *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001), *quoting Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982). Although depression and inability to follow instructions were not at issue in the ALJ's decision, Dr. Munday specifically addressed Plaintiff's claims of impaired memory and inability to pay attention. Accordingly, Dr. Diego's opinion, which purports to address Plaintiff's mental condition beginning with the September 2006 accident, must be considered material.

Plaintiff must also demonstrate, however, a reasonable possibility that Dr. Diego's opinion would have changed the outcome of the administrative hearing. *Mayes*, 276 F.3d at 462; *Booz v. Secretary of Health and Human Services*, 734 F.2d 1378, 1380-81 (9th Cir. 1984). No such possibility reasonably exists. In light of Plaintiff's seriously compromised credibility, the ALJ carefully scrutinized each medical opinion for an objective basis, minimizing the weight of those opinions premised primarily of Plaintiff's subjective representations. Dr. Diego's opinion not only sets forth no objective basis for its conclusions, it fails to set forth the nature of the relationship between Plaintiff and Dr. Diego. In addition, Dr. Diego offers an opinion regarding the ultimate legal determination – that Plaintiff is disabled. An ALJ need not give weight to a
///

1 | conclusory opinion supported by minimal clinical findings. *Meanel*, 172 F.3d at 1113;
2 | *Magallanes*, 881 F.2d at 751.
3 |       Even if the ALJ could consider a physician's ultimate opinion on the disability issue, Dr.
4 | Diego offered her opinion with CalWorks requirements, not SSI requirements, in mind.
5 | "CalWorks provides cash grants to families with minor children who meet certain requirements,
6 | including limited income and resources, and are deprived of the support of on or both parents due
7 | to factors such as absence, disability or unemployment." *Sneed v. Saenz*, 120 Cal.App. 4th 1220,
8 | 1231 (Cal.App. 4 Dist. 2004). Social Security disability programs and CalWorks "reflect laws,
9 | policies, and statutory schemes designed for different purposes and to alleviate different ills."
10 | *Watkins v. County of Alameda*, 177 Cal.App.4th 320, 340 (Cal.App. 1 Dist. 2009).
11 |       Because Dr. Diego's opinion is unlikely to change the administrative determination and
12 | because Plaintiff has offered no rationale for his failure to provide Dr. Diego's opinion before
13 | completion of the hearing decision, this Court declines Plaintiff's request that it remand this
14 | matter for re-consideration of the Commissioner's denial of SSI benefits to Plaintiff.

### 2. Frank Gray's Declaration

Plaintiff appends to his opening brief the declaration of his long-time friend, Frank Gray, regarding Plaintiff's functional impairments since the 2006 accident. "Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account, unless he ultimately determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'" *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). Friends and family members who are in a position to observe the claimant's symptoms and daily activities are competent to testify about their observations of the claimant's condition. *Dodrill*, 12 F.3d at 918-19. The opinions must be submitted on a timely basis, however. Because the Plaintiff offers no explanation for his failure to have submitted Mr. Gray's observations during the pendency of his SSI application, remand for consideration of Gray's declaration is inappropriate. *See* 42 U.S.C § 405(g).

///

///

### 3. Updated Medical Information

Plaintiff also appends to his opening brief medical documentation addressing the current state of his health. Because this evidence does not relate to the period considered in the hearing decision, remand to consider this information is inappropriate. *See* 42 U.S.C § 405(g). Should Plaintiff believe that he can establish changed circumstances, such as new and material changes to his residual functional capacity, age, education, or work experience, the appropriate course of action is the filing of a new SSI application. *See Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988); *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir. 1988).

### G. Additional Physical Impairments

For the first time in his opening brief, Plaintiff alleges that he suffers from pain in his muscles, legs, hands, wrists, and other portions of his body; that his hands shake constantly; that he has blurry vision; and that he suffers from depression. Plaintiff did not report these additional symptoms during the period covered by the decision that is at issue here. If Plaintiff has developed additional symptoms since the hearing decision and believes these additional symptoms significantly change his residual functional capacity, the appropriate course of action is the filing of a new SSI application. *See Chavez*, 844 F.2d at 693; *Gregory*, 844 F.2d at 666.

## III. Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated: November 27, 2012            /s/ Sandra M. Snyder
                                    UNITED STATES MAGISTRATE JUDGE